UNITED STATES of America ex rel. Raymond DUROCHER, Relator-Appellant,

v.

J. E. LaVALLEE, Warden, Clinton State Prison, Dannemora, N. Y., Respondent-Appellee.

UNITED STATES of America ex rel., James Jesse BROWN, Relator-Appellant,

v.

Robert E. MURPHY, Warden, Auburn Prison, Auburn, N. Y., Respondent-Appellee.

UNITED STATES of America ex rel. Marion RIPPLE, Relator-Appellant,

v.

Robert E. MURPHY, Warden, Auburn Prison, Auburn, N. Y., Respondent-Appellee.

UNITED STATES of America ex rel. William H. MOORE, Relator-Appellant,

v.

Robert E. MURPHY, Warden, Auburn Prison, Auburn, N. Y., Respondent-Appellee.

Nos. 131–135, Dockets 28174, 28190, 28243, 28279, 28280.

United States Court of Appeals Second Circuit.

Argued Oct. 11, 1963.

Submitted to In Banc Court Jan. 6, 1964.

Decided March 26, 1964.

Certiorari Denied June 22, 1964 See 84 S.Ct. 1921.

Leon B. Polsky, The Legal Aid Society, New York City (Anthony F. Marra, The Legal Aid Society, New York City, on the brief), for relators-appellants.

Ronald J. Offenkrantz, Deputy Asst. Atty. Gen. of New York, New York City (Louis J. Lefkowitz, Atty. Gen. of New York, Irving Galt, Asst. Sol. Gen., and

Mortimer Sattler, Asst. Atty. Gen., New York City, on the brief), for respondent-appellee LaVallee.

Ronald J. Offenkrantz, Deputy Asst. Atty. Gen. of New York, New York City (Louis J. Lefkowitz, Atty. Gen. of New York, Irving Galt, Asst. Sol. Gen., and Stephen N. Rubin, Deputy Asst. Atty. Gen., New York City, on the brief), for respondent-appellee Murphy in Nos. 28190, 28279, 28280.

Barry Mahoney, Deputy Asst. Atty. Gen. of New York, New York City (Louis J. Lefkowitz, Atty. Gen. of New York, Irving Galt, Asst. Sol. Gen., New York City, on the brief), for respondent-appellee Murphy in No. 28243.

Before LUMBARD, Chief Judge, and WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS and MARSHALL, Circuit Judges.[1]

KAUFMAN, Circuit Judge, with whom WATERMAN, SMITH, HAYS and MARSHALL, Circuit Judges, concur:

Claiming that they were not advised of their right to counsel when pleading guilty, four New York prisoners serving increased sentences as second offenders seek to invalidate their first convictions under the due process clause of the Fourteenth Amendment. In District Court opinions which preceded the Supreme Court's decision in Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), all four relators were denied relief on the ground that they had failed to establish that their convictions were lacking in fundamental fairness, as required by Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942). On appeal, all claim that the overruling of Betts by Gideon requires that they be afforded hearings in which an express finding of prejudice would

[1]. These appeals were originally heard by a panel consisting of Judges Clark, Moore and Kaufman. Writing for a majority of the panel, Judge Clark had prepared and circulated to the other members of the panel an opinion reversing and remanding the four cases for reconsideration in the light of Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Judge Clark having died before the opinion was filed, the Court decided *sua sponte* to consider the appeals *in banc*, in view of the significance of the questions here presented.

be unnecessary. They argue, in essence, that a criminal conviction cannot stand under Gideon if the convicted defendant was at no time apprised of his right to counsel, even in the absence of the sort of "special circumstances" which were long indispensable to relief under Betts.

These appeals mark the first occasion upon which this Court has been required to consider the scope and far-reaching implications of the Gideon decision. Specifically, we must now determine whether Gideon compels the offer of counsel to an indigent defendant who has pleaded guilty, and who has not expressly requested the services of an attorney. Finally, we must decide whether Gideon may be invoked by defendants whose convictions preceded that of Clarence Gideon himself.

## I.

The relevant facts of the individual cases may be briefly summarized.

■ 1. *#28174*—Raymond Durocher was convicted in May of 1959, of third-degree burglary and second-degree grand larceny, and was sentenced as a second offender to concurrent terms of 5–10, and 2½–5 years imprisonment.[2] His earlier conviction, used as a predicate for second-offender treatment, was for breaking and entering with intent to commit larceny, and was entered in Massachusetts on a plea of guilty in September of 1950. In his application for a writ of habeas corpus, Durocher alleged that he had been unaware of his right to counsel at the time of his guilty plea, that he had not been offered an attorney, although indigent, and that he had not understood the "legal interpretation" of the charges against him.

At a hearing granted upon his application, it was revealed that Durocher had been seventeen years of age at the time of his Massachusetts conviction, and that he had received a "partial seventh grade education." Testifying below in his own behalf, Durocher asserted that he could "read average," but admitted to considerable difficulty with "big words." The hearing further established that the Massachusetts offense had been Durocher's first, and that he had run away from home a year prior to his arrest.

Although finding no indication that Durocher had been advised of his right to counsel, the District Judge denied the petition on the basis of his conclusion that Durocher's conviction was not lacking in fundamental fairness. In so holding, the Judge emphasized that Durocher had understood the nature of the charges against him, and had not requested the assistance of an attorney. He relied heavily, moreover, upon Durocher's admission, at the time of his arrest, to entering a home and stealing several wrist watches; he abruptly dismissed Durocher's contentions that an attorney might have been able to prove that he had not 'broken" into the home, as charged in the complaint, but rather had entered through an open door.

2. *#28190*—Four years after his Florida conviction for escape from a road gang, James Jesse Brown was convicted in June of 1958 of second-degree grand larceny and was sentenced as a second offender to 5–10 years imprisonment. In his petition, Brown alleged that he had been illiterate at the time of the Florida conviction, and that the Assistant County Solicitor had threatened him with "plenty of time in prison" unless he pleaded guilty to the charges of escape. He further contended that he had "walked away" from the road gang because of the

2. While the sentences which Durocher received as a second offender did not exceed the maximum possible sentences for a first offender, this should in no way affect our result. Neither third-degree burglary nor second-degree grand larceny carries a mandatory minimum sentence for a first offender. N.Y. Penal Law, McKinney's Consol.Laws, c. 40, §§ 407 (3), 1297. It is possible, therefore, that upon resentencing, Durocher would receive a sentence shorter than the period which he has already served. This possibility is sufficient to warrant the issuance of a federal writ of habeas corpus. See United States ex rel. Smith v. Martin, 242 F.2d 701 (2d Cir. 1957); United States ex rel. Foreman v. Fay, 184 F. Supp. 535 (S.D.N.Y.1960).

"inhumane conditions" of his imprisonment.

Once again, despite a record which showed that Brown had appeared without counsel at his Florida conviction, the District Judge denied his petition. Rejecting Brown's claim of coercion as "vague, indefinite and implausible," the Judge concluded that "the petitioner voluntarily pleaded in Florida to simple charges that he well understood from previous criminal experience; that he was treated fairly; that his sentence was lenient and he was not misled, and under his own testimony he was not constitutionally deprived of counsel as the law now stands." The fact that Brown's petition was determined under the test of "fundamental fairness" was emphasized by the Court's citation of Betts v. Brady, as an indication of where "the law now stands," followed by the notation that Gideon was then pending before the Supreme Court.

3. *#28279, 28280*—Unlike Durocher and Brown, William Moore was never afforded a hearing below. Convicted of manslaughter on April 18, 1952, he was sentenced as a second offender to from 12½ to 25 years; his prior conviction was entered in Maryland, nine years earlier, upon a plea of guilty to attempted burglary. In his petition, he alleged that he had not known of his right to counsel at the time of his plea, and that he was never advised of any such right; he also claimed that he had been unaware of the "seariness" of the Maryland charges, and was never informed that they constituted a felony. His petition was denied, largely on the ground that his allegations were too "vague" to establish a denial of fundamental fairness. In so holding, the District Judge noted that Moore had been thirty-four years of age at the time of the Maryland conviction, and "not too immature" to understand the charges which he faced.

4. *#28243*—Marion Ripple, the fourth and final appellant, was convicted of first-degree manslaughter in September of 1954, and, as a result of a 1931 Indiana conviction for armed robbery, was sentenced as a second offender to from fifteen to thirty years. Finding that "petitioner was a mature man of thirty-nine years of age [in 1931] and the crime to which he entered a plea of guilty was easily understandable," the District Judge denied Ripple's petition without a hearing.

Ripple's case differs from that of the other appellants in several significant respects. Alone among the various petitioners, Ripple specifically alleged that he had requested counsel, and that his request had been denied. And in the application which he submitted to the District Judge for a certificate of probable cause, Ripple further maintained that he was "not financially unable to retain counsel," but instead asserted that he was "denied the opportunity to do so." In effect, therefore, Ripple was not claiming a denial of his right to court-appointed counsel, but a denial of the opportunity to secure private counsel of his own choosing.

## II.

 As the state implicitly concedes, no procedural obstacles bar our consideration of the merits of appellants' contentions. Since all of the second-offender sentences were imposed in New York and since all of the prior convictions were obtained in other states, there is no problem of exhaustion of state remedies. A New York prisoner is not obligated to challenge out-of-state convictions in the courts of the rendering state, and New York provides no procedure whereby these prior convictions may be challenged in the New York courts. United States ex rel. LaNear v. LaVallee, 306 F.2d 417 (2d Cir. 1962); see People v. Wilson, 13 N.Y.2d 277, 246 N.Y.S.2d 608, 196 N.E.2d 251. It is clear, moreover, that a prior conviction may be invalidated upon federal habeas corpus by a prisoner serving an increased sentence under a second-offender statute. United States ex rel. Easterling v. Wilkins, 303 F.2d 883 (2d Cir. 1962).

 The state has also conceded that Ripple's claim that he was not per-

III.

mitted to secure private counsel, as specifically detailed in his application for a certificate of probable cause, would have been sufficient to require a hearing had these allegations been contained in his original petition for a writ of habeas corpus. We agree, and we are further of the opinion that it would have been the better course for the District Judge to have considered Ripple's application for a certificate as a new or modified petition for a writ. Cf. United States v. Glass, 317 F.2d 200 (4th Cir. 1963). Accordingly, we remand Ripple's case for a hearing on his petition for a writ of habeas corpus as implemented by the more specific allegations contained in his application for a certificate.

We will concern ourselves hereafter, therefore, chiefly with the three remaining appellants. Although these three appellants seem to maintain that their prior convictions were invalid even under the "fundamental fairness" test of Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942), their more substantial contentions are based on the premise that such a showing is unnecessary. They argue, in brief, that Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), imposed an absolute requirement that indigent defendants be afforded court-appointed counsel. Absent an express waiver of that right, they insist that the failure of a court to offer the assistance of counsel is sufficient to invalidate a conviction under the due process clause of the Fourteenth Amendment. Each of the three appellants has alleged that he was unrepresented by counsel at the time of his prior conviction, and that he was never afforded the opportunity to secure court-appointed counsel; each has further claimed that he was indigent when he pleaded guilty, and that he did not waive his right to an attorney. If, therefore, Gideon is to be retroactively applied to convictions bottomed upon a plea of guilty, we would be compelled to reverse the decisions below and remand for new hearings under the standards of Gideon v. Wainwright. We now turn to a consideration of these vitally significant questions.

Simply stated, we are convinced that Gideon's requirement of court-appointed counsel cannot be limited to cases in which a "not guilty" plea has been entered—the context in which Gideon itself was decided. Indeed, we would be less than candid were we even to consider the question as an original matter; even if Gideon may be said to have left the issue open, our conclusion seems plainly required by the Supreme Court's recent disposition of Doughty v. Maxwell, 376 U.S. 202, 84 S.Ct. 702, 11 L.Ed.2d 650.

Doughty had been indicted for rape in 1958. Although "discussing" the possibility of securing counsel with his wife, he entered a plea of guilty in January of 1959, without ever requesting the assistance of an attorney. Sentenced to prison, he sought habeas corpus in the state courts of Ohio, alleging, inter alia, that his right to counsel had been infringed. In an opinion filed before Gideon was decided, the Supreme Court of Ohio rejected his petition, on the ground that Doughty had waived his right to counsel by pleading guilty. Doughty v. Sacks, 173 Ohio St. 407, 183 N.E.2d 368 (1962).

Doughty's petition for certiorari reached the Supreme Court after the decision in Gideon. In a brief per curiam opinion, the Court reversed and remanded the Ohio judgment for "further consideration in light of Gideon v. Wainwright." 372 U.S. 781, 83 S.Ct. 1106, 10 L.Ed.2d 139 (1963). On remand, however, the Ohio Court adhered to its previous decision after concluding that Gideon was not dispositive because Doughty had failed to request the assistance of counsel. 175 Ohio St. 46, 191 N.E.2d 727 (1963). It was this second Ohio decision, refusing to apply Gideon to a case in which the defendant pleaded guilty and did not request counsel, which the Supreme Court summarily reversed in a brief per curiam order, on the authority of Gideon and Carnley v.

Cochran, 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70 (1961).

■■ It is well established in federal prosecutions that the failure to advise a defendant of his right to counsel will invalidate a plea of guilty even in the absence of a showing of prejudice. United States v. Lavelle, 306 F.2d 216 (2d Cir. 1962); cf. United States v. Tribote, 297 F.2d 598 (2d Cir.1961) (counsel must be afforded not only at time of plea but at sentence as well). In light of the Gideon rationale and the precise ruling in Doughty, we feel constrained to hold that state convictions, when founded on a plea of guilty by a defendant unaware of his right to counsel, similarly cannot stand.

Such a result is clearly in keeping with the spirit of Gideon. As expressed by the Gideon Court, 372 U.S. at 344–345, 83 S.Ct. 792, 796–797, 9 L.Ed.2d 799, our country has long prized the notion of "impartial tribunals in which every defendant stands equal before the law. [But] [t]his noble ideal cannot be realized if the poor man charged with crime has to face his accusers without a lawyer to assist him. A defendant's need for a lawyer is nowhere better stated than in the moving words of Mr. Justice Sutherland in Powell v. Alabama: 'The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. * * * He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step of the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.' 287 U.S. [45] at 68–69, 53 S.Ct. [55] at 64, 77 L.Ed. 158."

While written with reference to a defendant's rights in a criminal trial, these words seem to carry no less force when applied to an uncounselled defendant compelled to plead unaided to criminal charges. Bewildered by the mystifying language in which legal documents are cast, he too will generally be incapable "of determining for himself whether the indictment is good or bad." Overwhelmed by the seemingly overpowering resources of the state, he may elect to plead guilty because he feels woefully ill-equipped to prepare his defense, "even though he have a perfect one." Unlike the defendant financially able to retain an attorney, he may be unaware of legal defects and complexities in the charges against him, and plead guilty to an offense which he has not committed. Indeed, the appeals now before us furnish striking proof that this possibility is more than theoretical. Thus, for example, had Durocher been aided by counsel, he might have been advised that he had not technically "broken" into a private dwelling as charged in the complaint, or lacked the intent required by the relevant state statute, and hence had a good defense to the serious offense charged. Cf. United States ex rel. Foreman v. Fay, 184 F.Supp. 535 (S.D.N.Y. 1960).

Before Gideon, it may have been possible to argue that the more egregious cases of prejudice could be rectified if pleas of guilty were reviewed for "fundamental fairness." But it was precisely this sort of elusive and unsatisfactory inquiry into the possibility of prejudice which Gideon sought to inter once and for all. Indeed, the overruling of Betts by Gideon seems grounded on two fundamental assumptions: that a criminal defendant compelled to act without the advice of counsel will always be disadvantaged thereby, and that the precise degree of that disadvantage can never be satisfactorily measured by an after-the-fact search for prejudice. Since the considerations which impelled the Gideon Court to abandon the "fundamental fairness" test seem equally applicable to

guilty pleas, there would seem no warrant for resurrecting a rule of law which has been so thoroughly discredited. For, if anything, the impossibility of determining just how much a defendant was injured by the absence of counsel is all the greater where guilty pleas are involved, since court records and transcripts will not contain all the detailed facts relevant to such a determination and ordinarily available in cases where there has been a trial.

In Hamilton v. Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961), a unanimous Supreme Court held that a state could not deny counsel to a defendant required to plead to capital charges. Citing Hamilton, Mr. Justice Clark explained in a concurring opinion to Gideon that the latter decision "does no more than erase a distinction which has no basis in logic and an increasingly eroded basis in authority," since "the Constitution makes no distinction between capital and noncapital cases." 372 U.S. 348–349, 83 S.Ct. 799, 9 L.Ed.2d 799. Similarly, Mr. Justice Harlan observed in his Gideon concurrence that the "special circumstances rule has been formally abandoned in capital cases, and the time has now come when it should be similarly abandoned in noncapital cases * * *." Id. at 351, 83 S.Ct. 801, 9 L.Ed.2d 799. After Hamilton, a capital conviction could hardly be supported if a defendant were denied the assistance of counsel at a critical stage in the proceedings. Since the Constitution forbids the taking of life *and* liberty without due process of law, there seems no reason why a distinction which the Supreme Court has taken such pains to lay to rest should be perpetuated.

To return to the language of Gideon: "Governments, both state and federal, quite properly spend vast sums of money to establish machinery to try defendants accused of crime. Lawyers to prosecute are everywhere deemed essential to protect the public's interest in an orderly society. Similarly, there are few defendants charged with crime, few indeed, who fail to hire the best lawyers they can get to prepare and present their defenses. That government hires lawyers to prosecute and defendants who have the money hire lawyers to defend are the strongest indications of the widespread belief that lawyers in criminal courts are necessities, not luxuries." 372 U.S. at 344, 83 S.Ct. at 796, 9 L.Ed.2d 799.

## IV.

Well before Doughty, the Supreme Court had made it clear that a defendant otherwise entitled to the assistance of counsel does not lose that right by his failure to request an attorney at the time of his conviction. In the words of Mr. Justice Brennan, writing for the Court in Carnley v. Cochran, 369 U.S. 506, 513, 82 S.Ct. 884, 889, 8 L.Ed.2d 70 (1962), "it is settled that where the assistance of counsel is a constitutional requisite, the right to be furnished counsel does not depend on a request." Indeed, as early as 1945, the Supreme Court held in Rice v. Olson, 324 U.S. 786, 65 S.Ct. 989, 89 L.Ed. 1367 (1945), that a plea of guilty cannot operate as a waiver of court-appointed counsel, and that the absence of a request therefor was totally irrelevant to a determination of whether counsel should have been appointed.

Especially as applied to Gideon, this doctrine clearly seems correct. If we were to hold that Gideon might not be invoked by those who did not request the assistance of counsel, we would be penalizing precisely those defendants whom Gideon was most intended to protect— those so ignorant of or unfamiliar with criminal procedures that they were not even sufficiently sophisticated to request court-appointed counsel. Since any request would presumably have been denied under Betts, we would at best be requiring that defendants perform a meaningless ritual in order to preserve vitally important constitutional rights. So to hold would make a mockery of the classic definition of waiver enunciated in Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and recently reaffirmed in the context of a federal habeas corpus application by a state prisoner, Fay v. Noia, 372 U.S. 391,

439, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). Under this familiar standard, waiver may not be implied by the bare failure to act; rather, there must be "an intentional relinquishment or abandonment of a known right or privilege." Where, as here, petitioners allege that they were unaware of their right to counsel, that they were never so advised, and that, in fact, the Supreme Court did not recognize their right until after their convictions, a finding of waiver would border on the fanciful.

## V.

We have thus concluded that the force of Gideon v. Wainwright is in no way lessened in these cases merely because the appellants pleaded guilty and failed to request the assistance of counsel. We are left with the question whether Gideon is to be retrospectively applied—whether it may be invoked by defendants whose convictions preceded that of Gideon himself.

After Doughty, which set aside a pre-Gideon conviction for lack of counsel, this question of retrospective application is no longer open to us. In a real sense,

however, Doughty was inevitable; the fundamental nature of the right to counsel and its essential place in the very concept of a fair trial compelled such a holding.[3] Before his death, Judge Clark prepared an opinion for the Court which traced, in reasoned and scholarly fashion, the compelling considerations which even before Doughty seemed to require a holding of retroactivity. We subscribe fully to his conclusion, and we hence offer relevant portions of his opinion as the best possible exposition of the factors which seem to us so decisive and which led ineluctably to the summary disposition of Doughty in the Supreme Court's two-sentence *per curiam* memorandum.

"*First.* The principle announced in Gideon was applied retrospectively in that very case to grant relief to Clarence E. Gideon, convicted on August 4, 1961.[4] Thus we begin with the fact that the Court overruled Betts v. Brady, supra, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595 characterized in Gideon as 'an anachronism when it was handed down,' in a habeas corpus case rather than in a case before it from a direct appeal, as it could easily have done had it intended

3. In determining whether a decision is to be retroactively applied, commentators have often suggested a test based on whether the underlying "purpose" of that decision would be served thereby. See, e. g., Comment, Prospective Overruling and Retroactive Application in the Federal Courts, 71 Yale L.J. 907 (1962). Under such an analysis, for example, a distinction might be drawn between Gideon and a case such as Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). It might be argued, in this regard, that the exclusionary rule of Mapp is not designed to protect the "fairness" of the actual trial, but rather to serve as a deterrent to oppressive police conduct. If this is true, it might be maintained that Mapp has less of a claim to retroactive application than does Gideon, since Mapp could hardly be expected to "deter" searches which took place prior to the date of its decision. See United States ex rel. Linkletter v. Walker, 323 F.2d 11 (5th Cir. 1963). It is not now necessary to express any view as to the validity of this sort of analysis, and we expressly disclaim any intention here to

decide whether Mapp is to be retroactively applied. Considerations of this sort do, however, indicate that Gideon and Mapp present quite different questions, and that a holding that the former is retroactive by no means compels a similar result when the latter issue is before us.

4. If Gideon were applied prospectively only there would be no totally defensible cut-off point for retrospective application. Since Clarence E. Gideon was convicted on August 4, 1961, and was given relief, the decision must apply back to that date to insure equal protection of the laws. Logically, however, it could be argued that the decision must apply back to some point during the trial when Gideon was deprived of counsel—or perhaps even to his arrest. Do the rights of prisoners tried during the summer of 1961 depend on whether they were tried during, before, or after Gideon's trial—or his arrest—or his sentencing? Or perhaps the alleged date of the crime is critical. Against such casuistry we hasten to add our simple point: Constitutional rights should not depend on arcane logic or trivial events.

the overruling to be prospective only.[5] Moreover, there is not the slightest hint in the decision that its application is to be restricted to prospective application * * *. This silence is made even more meaningful by the fact that 22 states as *amici* had urged the Court to deny retrospective effect to the decision.

"*Second*. Subsequent to the decision the Court has remanded upwards of forty cases 'for further consideration in light of Gideon v. Wainwright * * *' The summary disposition of these appeals is a clear, if inexplicit, indication that Gideon is to be applied retroactively. See United States ex rel. Craig v. Myers, D.C.E.D.Pa., 220 F.Supp. 762, 763. This fact was highlighted by Justice Harlan's dissent in Pickelsimer v. Wainwright, 375 U.S. 2, 3, 84 S.Ct. 80, 81, 11 L.Ed. 2d 41, where he stated: 'I am unable to agree with the Court's summary disposition of these 10 Florida cases, and believe that the federal question *which they present* in common is deserving a full-dress consideration. That question is whether the denial of an indigent defendant's right to court-appointed counsel in a state criminal trial as established last Term in Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, overruling Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595, invalidates his pre-Gideon conviction.' (Emphasis added.)

"*Third*. We are therefore constrained to hold it settled law that Gideon is to be applied retrospectively.[6] Chief Judge Sobeloff put the case strongly when concurring in Jones v. Cunningham, 4 Cir., 319 F.2d 1, 5, where the majority avoided the question of retroactivity by deciding that the relator was entitled to relief even under the Betts rule: 'I would prefer that the court face the question whether the teaching of Gideon v. Wainwright should be applied here. I have no doubt that it should. * * * Once it is acknowledged that a conviction under review was obtained in violation of the constitutional right to counsel, a new trial should be awarded and it should make no difference whether the violation occurred before or after the Gideon decision. The fact that the defendant spent a number of years in prison under a fatally void conviction is no reason to continue to deny him his rights at a new and constitutional trial, irrespective of the presence or absence of special circumstances. This is made especially clear by the Supreme Court's recognition that the more restrictive decision in Betts v. Brady was 'an abrupt break with its own well-considered precedents' (372 U.S. at 344, 83 S.Ct. at 796–797, 9 L.Ed.2d 799).' See also United States ex rel. Craig v. Myers, supra, D.C.E.D.Pa., 220 F.Supp. 762. Thus it is significant that no court save one has held Gideon prospective only, and that in the one the holding was without visible reasoning or support. Commonwealth of Pennsylvania ex rel. Craig v. Banmiller, 410 Pa. 584, 189 A.2d 875. But see United

5. As in Patterson v. Warden, Md. Penitentiary, 372 U.S. 776, 83 S.Ct. 1103, 10 L.Ed.2d 137, decided April 22, 1963.

6. That result is also assumed in the following precedents: Lopez v. United States, 373 U.S. 427, 445, 83 S.Ct. 1381, 10 L.Ed.2d 462, where in a case involving a preGideon trial, Warren, Ch. J., in concurring in the result, stated that a right to counsel might be involved, and cited Gideon; Striker v. Pancher, 6 Cir., 317 F.2d 780, 783, where in a damage suit for deprivation of constitutional rights by a former prisoner against a sheriff the court stated: "Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942) has since been overruled, and the law as announced in the later case [Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)] must be viewed as the law in the prior period"; Nolan v. Nash, 8 Cir., 316 F.2d 776, 777, where the court apparently applied Gideon standards in an appeal from a denial of habeas corpus challenging a 1942 conviction; People v. Callahan, 19 A.D.2d 585, 240 N.Y.S.2d 460, applying Gideon standards to a 1962 resentencing procedure; and Tull v. Cochran, Fla., 154 So.2d 837, one of the numerous Florida cases vacated and remanded for reconsideration in light of Gideon. The Florida supreme court is apparently uniformly applying Gideon retroactively. See Gideon v. Wainwright, Fla., 153 So.2d 299 (on remand).

States ex rel. Craig v. Myers, supra, D.C.E.D.Pa., 220 F.Supp. 762; Jones v. Cunningham, supra, 4 Cir., 319 F.2d 1.

*"Fourth.* But were we to conclude that the Court had left the question of Gideon's retroactive application an open one, we would nevertheless believe it necessary to hold it retrospective.[7] Of course, we are past the splendid myth of 'discovered law,' 1 Blackstone, Commentaries 70, which once would have foreclosed discussion of the question. See Griffin v. Illinois, 351 U.S. 12, 26, 76 S.Ct. 585, 100 L.Ed. 891 (Frankfurter, J., concurring); Chicot County Drainage Dist. v. Baxter State Bank, 308 U.S. 371, 374, 60 S.Ct. 317, 84 L.Ed. 329; Great Northern R. Co. v. Sunburst Oil & Refining Co., 287 U.S. 358, 363–366, 53 S.Ct. 145, 77 L.Ed. 360, 85 A.L.R. 254; Address of Chief Judge Cardozo, 55 N.Y. St. Bar Ass'n Rep. 263, 294 et seq. (1932), reprinted in Hall, Selected Writings of Benjamin Nathan Cardozo 7, 33 (1947); Comment, Prospective Overruling and Retroactive Application in the Federal Courts, 71 Yale L.J. 907 (1962). But cf. James v. United States, 366 U.S. 213, 247, 81 S.Ct. 1052, 6 L.Ed.2d 246 (Harlan, J., concurring in part and dissenting in part); Hall v. Warden, Md. Penitentiary, 4 Cir., 313 F.2d 483. We do not deal here, however, with considerations of *res judicata* and vested rights, but with the question whether, consonant with our society's conceptions of due process and general constitutional law, we could deny the constitutional right enunciated in Gideon to those who happened to be tried before the decision was handed down.[8] Thus to hold would be to assign a lower constitutional status to pre-Gideon prisoners who were denied the right to counsel, a right so 'fundamental and essential to a fair trial' that it is made obligatory upon the States by the Fourteenth Amendment to the United States Constitution; a right that has been characterized by the Court as a 'basic minimal' right vouchsafed by the Constitution, Rideau v. Louisiana, 373 U.S. 723, 726, 83 S.Ct. 1417, 10 L.Ed.2d 663. There is no question that such prisoners were subjected to an unfair trial. The only question is whether we will deny them relief. We do not believe that our constitutional standards would permit such a denial."

## VI.

In following Doughty and concluding that Gideon must be retrospectively applied, we are not unmindful of nor unconcerned with the practical difficulties engendered by such a decision, and the great burden which it will place upon the District Judges. It is likely that the number of state prisoners able to avail themselves of Gideon will far exceed the number of federal offenders, convicted without counsel, who spurred the "avalanche" of petitions which followed Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and its holding that the failure to provide counsel in federal prosecutions could furnish the basis for post-conviction collateral relief. While Johnson applied only to federal prisoners, Gideon affects prisoners convicted under many state criminal systems.

It is also likely that the state prisoners benefitted by Gideon will include far more serious offenders than the federal prisoners affected by Johnson v. Zerbst. Not only do the state courts, by and large, deal with the more serious offenders, but state sentences are notoriously longer than federal sentences, and hence more petitions will be forthcoming. Indeed, those prisoners who have committed the more serious crimes and who are thus serving the longer sentences may be

7. In Otten v. Warden, Baltimore City Jail, D.C.Md., 216 F.Supp. 289, the question of Gideon's retroactivity was listed as an open one.

8. See Ex parte Siebold, 100 U.S. 371, 377, 25 L.Ed. 717; see also Note, Prospective Operation of Decisions Holding Statutes Unconstitutional or Overruling Prior Decisions, 60 Harv.L.Rev. 437, 446 (1947); cf. James v. United States, 366 U.S. 213, 224, 81 S.Ct. 1052, 6 L.Ed.2d 646 (Black, J., concurring in part and dissenting in part).

the primary beneficiaries of our ruling. Because they have been incarcerated for a longer period and in view of the fact that more time has thus elapsed since the commission of their crime, it will be the hardest to retry precisely those offenders who, in the interests of an ordered society, should least be permitted to remain at large.

Finally, the District Courts may find it difficult to determine whether those tried in the remote past were indeed denied the assistance of counsel. Records may be stale, incomplete, or missing, and it may hence be difficult accurately to reconstruct events at prosecutions long ago and far away.

These prospects are deeply disturbing. Here, however, the fundamental nature of the right protected by Gideon v. Wainwright and the injustice attendant upon the continued imprisonment of those defendants who have been denied representation by counsel at an important stage of a criminal prosecution, have precluded the limitation of Gideon to prospective application. As the Supreme Court recognized in Gideon and as Judge Clark was careful to make clear, "under our Constitution, fair trial is not a luxury, but a necessity."

## VII.

We have thus concluded that the decisions before us must be reversed, and the cases remanded for further proceedings. We believe, in sum, that the principles which underlie Gideon v. Wainwright may not logically be restricted either to cases involving "not guilty" pleas nor to those which postdated Gideon. The disposition of Ripple's case has already been considered; a brief word is in order with respect to the remaining appellants.

Although Durocher and Brown have both been afforded a hearing, the inquiry in both cases was directed to whether the "special circumstances" required under Betts had been sufficiently established. Since Gideon has eliminated the necessity of such a showing, we believe that both are entitled to a new hearing under Gideon. Moore's petition was de-

nied on the papers submitted; under our view of the effect of Gideon, his petition is now clearly sufficient to require a hearing.

On remand, the District Courts will, of course, hardly be compelled to accept the petitioners' allegations as true. Gideon has changed a rule of law, but it has not abrogated the traditional responsibility of the District Courts accurately to determine the factual patterns upon which that law is to be applied. While issues of "fundamental fairness" have been removed from their consideration, the District Courts will now be confronted with factual determinations as to whether each appellant was, in fact, advised of his right to counsel, whether he waived that right, and if not, and if indigent, whether he was afforded court-appointed counsel. In resolving such questions, there is no reason to suppose that the Courts will not employ the methods and techniques which have long been familiar to our judicial system. Thus, they will undoubtedly consider the appellant's credibility; available court records; the prevailing practices of a particular state; any evidence which the State might choose to offer; and all other relevant considerations. In short, though on occasion difficult, there is no reason to believe that the determinations required by Gideon will be any more incapable of resolution that those required by Betts, and, indeed, the elimination of the search for "fundamental fairness" would indicate that the task of the District Courts has been greatly simplified. No more than before will the Courts be required to treat bare allegations of the denial of constitutional rights as tantamount to conclusive proof that these rights were, in fact, denied.

It is appropriate that we conclude with these words from Gideon v. Wainwright: "reason and reflection require us to recognize that in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him." 372

U.S. at 344, 83 S.Ct. at 796, 9 L.Ed.2d 799. This principle is no less valid in the cases before us than it was in Gideon itself.

Reversed and remanded for hearings in accordance with this opinion.

FRIENDLY, Circuit Judge (concurring):

If I could regard the issue as still open, I should have supposed there might be a substantial distinction between a state's forcing an accused who asserts his innocence of a serious crime to defend himself without the assistance of counsel, as in Gideon v. Wainwright, 372 U.S. 335, 82 S.Ct. 792, 9 L.Ed.2d 799 (1963), a practice which, in Mr. Justice Cardozo's great words, is "repugnant to the conscience of mankind" and violative "of a scheme of ordered liberty," Palko v. Connecticut, 302 U.S. 319, 323, 325, 58 S.Ct. 149, 151, 152, 82 L.Ed. 288 (1937), and accepting a plea of guilty from a man, often with many previous brushes with the criminal law, caught in the commission of a garden-variety offense or with the means or fruits of its commission upon him. I should have found it hard to believe that due process of law invariably required a state to make certain that such a man had deliberately foregone the aid of counsel before he elected to plead guilty to the charge rather than stand a trial which he knew neither could nor should be won. Even if this should be the rule for the future, the case against its application to guilty pleas of long ago would have seemed formidable, since, as experience tells us, the vast majority of prisoners who would thus be turned loose on society because of the loss of evidence once available (or, as here, because the attack is on a sentence already served and now used as a basis for further punishment) could not have benefited from the aid now asserted to have been unconstitutionally withheld; due process would have seemed to me to require some weighing of the interest of the ordinary law-abiding citizen against the rare case of the prisoner who might have successfully maintained a not guilty plea if properly advised. I should therefore have voted to affirm the orders here made after hearing with respect to Durocher and Brown and to remand for a hearing to determine whether fundamental fairness was violated by the acceptance of Moore's plea, while joining in the majority's disposition of Ripple's very different case.

However, the two sentence *per curiam* decision in Doughty v. Maxwell, 376 U.S. 202, 84 S.Ct. 702, 11 L.Ed.2d 650 (1964), dealing with a guilty plea four years prior to the Gideon decision, proves to me that the Supreme Court does not regard the distinction I would have thought significant as even warranting discussion. Although I would like to be able to construe the decision as limited to guilty pleas of relatively recent vintage, as Chief Judge LUMBARD does, I cannot believe that if this was all the Court meant, it would not have said so. Because of the authority of that decision, I join in the judgment here.

LUMBARD, Chief Judge (with whom MOORE, Circuit Judge, concurs), dissenting:

While I agree with Judge KAUFMAN that Gideon v. Wainwright requires that defendants in state felony proceedings be advised of their right to counsel whether they plead guilty or stand trial, I cannot agree that that principle must or should be applied now to the pleas of guilty entered by Ripple in 1931, by Moore in 1943, by Durocher in 1950, and by Brown in 1954.

By its action in Doughty, the Supreme Court did look back to 1959. But the Court gave no reasons in support of its summary 22-word reversal. Until the Court specifically invalidates pleas of guilty entered prior to 1959, it seems to me that we should not look backwards to any earlier year. There are compelling reasons why we should not subject the states to the hazards of reprosecuting cases where the events in question are more than five years old.

Gideon clearly establishes that states must now provide counsel to indigent defendants faced with felony charges unless such defendants knowingly waive their right to counsel. Failure to provide counsel, in the absence of such a waiver, will invalidate any conviction. Thus Gideon will have served its primary purpose in assuring indigent defendants the aid of counsel from this time henceforth.

What then do the federal courts accomplish if they choose to apply Gideon retroactively without limit of time? Until the Gideon decision of March 18, 1963, the states operated under the rule of Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942), that state convictions in non-capital cases were invulnerable to attack on the ground that the defendant had not been represented by counsel unless he could establish that lack of counsel had resulted in fundamental unfairness.

While to many of us the continued failure of the states to provide counsel to the indigent defendant in felony cases seemed a black chapter in the history of American law [1]—and as time goes by will seem even more inexplicable—there were many reasonable men who thought that the states were doing substantial justice and, in any event, that the federal courts should intervene only upon a positive showing that the defendant had been unfairly treated.

The wonder is that Gideon did not come sooner. The question must have been raised in scores of the many hundred *pro se* applications from state prisoners which deluged the Supreme Court and other federal courts in the years prior to March 1963. By 1963 there were in the prisons of most of the fifty states thousands of defendants who had pleaded guilty without offer of counsel and without benefit of counsel.

But the fact that some change in the law was necessary and indeed long overdue does not justify in itself the unlimited retroactive application of that change when finally effected. Throughout this country considerably more than 80 per cent of those accused of serious crimes plead guilty whether or not represented by counsel. Thus, there can be no doubt that state prisoners serving sentences imposed after pleas of guilty did, in fact, commit the crimes for which they are now imprisoned as they have admitted this by their plea of guilty. The petitions of Ripple, Moore, Durocher, and Brown make it crystal clear that they had in fact committed the acts as charged in the indictment to which they pleaded guilty. While counsel might have advised or negotiated some mitigation of plea or sentence, an overwhelming percentage of unrepresented indigent defendants would have borne the stigma of conviction in any event; assistance of counsel could have resulted at best in only a very small percentage of acquittals or dismissals.

Unlimited retroactive application of Gideon would thus compel the release of thousands of felons who can no longer be tried because witnesses and evidence are no longer available. Indeed it is the more hardened criminals who profit most by unlimited retroactivity, for they are still serving lengthy sentences imposed long ago at a time when the states could properly assume that fundamental fairness was the applicable test. As to the overwhelming majority of such prisoners there can be no doubt that they received substantially fair treatment. The majority opinion would not only let them out of jail but it would permit them to have the slate wiped clean by reason of the passage of time which renders the state unable now to prove its case. To require the release of thousands of state prisoners who undoubtedly are guilty of crimes serious enough to justify long terms of imprisonment strikes a severe blow to enforcement of law and the administration of criminal justice.

On the other hand, were we to limit the retroactive effect of Gideon and Doughty to the period of time neces-

---

1. The writer expressed this opinion in 1952. 37 Cornell Law Quarterly 555.

sarily comprehended in those cases, the states might still prosecute most of such defendants and bring them to trial if new pleas of guilty were not forthcoming. Fortunately, or not, the Supreme Court has chosen to act in cases where the criminal charges are relatively recent in point of time, much more so than in the cases before us. Gideon was tried in 1961 on charges that he had committed an offense earlier that same year. The state did in fact retry him, albeit unsuccessfully. The charge against Doughty was for rape allegedly committed in 1958, and his plea of guilty was entered in 1959.

We do not know whether the Supreme Court thus meant to leave open the question of retrospective application to convictions prior to 1959. While we must now go as far as that Court went, so that other defendants who were unrepresented as were Gideon and Doughty are not denied the equal protection of those decisions, it seems to me that retrospective effect prior to 1959 is fraught with so many unfavorable consequences which far outweigh the little good which might possibly flow from such action that I would do no more than what the Supreme Court has already chosen to do in these two cases.

We have been admonished many times that federal courts ought not to interfere with the administration of criminal justice by the states. Mr. Justice Harlan, writing for a majority of the Supreme Court, said in Hoag v. New Jersey, 356 U.S. 464 at 468, 78 S.Ct. 829 at 833, 2 L.Ed.2d 913 (1958): "For it has long been recognized as the very essence of our federalism that the States should have the widest latitude in the administration of their own systems of criminal justice." See also Twining v. New Jersey, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908). Surely any federal court of less stature than the Supreme Court ought not go one step further than is necessary to carry out the plain and expressed mandate of that Court where to do so will certainly amount to a wholesale jail delivery from many state prisons

in this country. At the very least it would seem that the Court has left open the question of how far it will go into the past to give retrospective effect to Gideon and Doughty. See Justice Harlan's dissent in Pickelsimer v. Wainwright, 375 U.S. 2, 3, 84 S.Ct. 80, 11 L. Ed.2d 41 (1963). And no one would doubt the power of the Court to say how far back into the past a newly made rule, even one declaring constitutional rights, must be applied. See Griffin v. Illinois, 351 U.S. 12, 25–26, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (Frankfurter, J., concurring); Bender, Retroactive Effect of an Overruling Constitutional Decision: Mapp v. Ohio, 110 U.Pa.L.Rev. 650 (1962); Traynor, Mapp v. Ohio at Large in the Fifty States, 1962 Duke L. J. 319, 338–42; Note, Prospective Overruling and Retroactive Application in the Federal Courts, 71 Yale L.J. 907, 909–33 (1962); Snyder, Retrospective Operation of Overruling Decisions, 35 Ill.L.Rev. 121 (1940).

For the above reasons I would affirm the orders of the district court in all four cases.